## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| REYNALDO AMAYA, | § | |
| (TDCJ-CID #1607287) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-14-2834 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

The petitioner, Reynaldo Amaya, challenges his 2009 conviction for aggravated assault. He sues under 28 U.S.C. § 2254, alleging ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and trial court errors. The respondent moved for summary judgment, (Docket Entry No. 41), and filed a copy of the state-court records. (Docket Entries Nos. 14, 15, 19, 39, and 40). Amaya responded. (Docket Entries Nos. 46 & 47).

Based on the pleadings, the motions and briefs, the record, and the applicable law, the court grants the respondent's motion, denies Amaya's motion, and enters final judgment dismissing the case by separate order. The reasons for these rulings are set out below.

### I.    Procedural Background

Amaya was convicted of aggravated assault in September 2009 and sentenced to an 18-year prison term. (Cause No. 1186977). The First Court of Appeals of Texas affirmed Amaya's conviction on November 8, 2011. *Amaya v. State*, 01–09–00848–CR, 2011 WL 1529732 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd, not designated for publication). The Texas Court of

Criminal Appeals refused his petition for discretionary review on August 24, 2011. Amaya filed an application for state habeas corpus relief on March 12, 2013, which the Texas Court of Criminal Appeals denied, without a hearing or written order, on findings of the trial court, on September 16, 2015. (Docket Entry No. 39-1, p. 1).

In this federal habeas petition, Amaya asserts the following claims:

(1)      Trial counsel, Kennitra M. Foote, provided ineffective assistance by:

      (a)      failing to secure expert witnesses to testify to Amaya's lack of intent;

      (b)      failing to seek out and present other witnesses favorable to the defense during both phases of trial;

      (c)      failing to interview State witnesses;

      (d)      failing to conduct an adequate investigation;

      (e)      failing to have a firm command of the facts of the case;

      (f)      failing to sufficiently object to improper direct examination or closing argument during both phases of trial;

      (g)      failing to object to extraneous offense evidence during the punishment phase of trial; and

      (h)      committing an accumulation of errors that made her assistance ineffective.

(2)      The prosecution violated Amaya's constitutional rights by:

      (a)      presenting perjured testimony and fabricated evidence;

      (b)      failing to comply with the court's order granting discovery;

      (c)      making improper arguments during both phases of trial; and

      (d)      preventing the victim from speaking to Amaya's investigator.

(3)    The trial court erred by:

    (a)    admitting a crowbar as a demonstrative aid;

    (b)    admitting a photographic lineup into evidence;

    (c)    admitting an audio recording of Amaya into evidence;

    (d)    limiting trial counsel's time for closing argument;

    (e)    failing to instruct the jury on reasonable doubt when the prosecution introduced evidence of extraneous offenses; and

    (f)    failing to require notice from the state.

(4)    Appellate counsel, Brian W. Wice and Josh Schaffer, provided ineffective assistance by failing to raise the following issues on direct appeal:

    (a)    improper admission of State's exhibits, photographic lineup, and audio recording of Amaya; and

    (b)    ineffective assistance of trial counsel.

Each claim and the response is examined in light of the state-court record and the governing law.

## II.    Factual Background

The state appellate court summarized the evidence at trial, as follows:

Dawn Rowland, complainant, was at the West End Pub with some friends on the night of October 4, 2008. Appellant was also at the bar with Sherrie Carroll, his girlfriend at the time, and Manuel Matala. At a certain point, appellant ordered some drinks for Rowland and one of her friends. Rowland and her friend declined the drinks. Rowland testified that appellant subsequently made repeated crude comments and gestures to her.

Rowland complained to the owner of the bar. The owner told her he would take care of it. She also told Michael Lewis, a friend that she knew from the bar, that appellant

3

was harassing her. The owner told Lewis he could ask appellant to leave. Lewis approached appellant and told him he had to leave. Appellant became aggressive and a brief fight ensued. Appellant threatened to call for police assistance, but later left.

After the bar closed, Rowland left with Andrea Hunsucker. They planned to drive their cars to another friend's house. As she left, she noticed a car pull up behind her and begin following her. Another person that was at the bar that night and that saw the fight between Lewis and appellant testified that he saw appellant and his girlfriend in a silver or gray BMW follow Rowland's car out of the parking lot.

When she arrived at her destination, Rowland saw a man approach her car and smash in the driver's side window. The man hit her with a crowbar. Rowland escaped outside the passenger's side window and attempted to run away. She fell when the assailant hit her knees. The assailant continued to hit her over 20 times with the crowbar, yelling things like "this is how it feels." At this point, Rowland recognized appellant as the assailant.

Hunsucker witnessed the assault and recognized appellant as well. She was talking on her cell phone to her friend in the house, Colby Van Cleave, and yelled for help. When Van Cleave ran out of the house, he saw a silver BMW speeding away. Van Cleave picked up a cinder block he kept on his property and threw it at the car. The cinder block hit one of the side mirrors on the car. Later, a piece of a car mirror was found on the street where Van Cleave had thrown the cinder block.

One of the investigating officers later located appellant's silver BMW at a repair shop. The car had sustained damage to one of the side mirrors and one of the doors, though the mirror fragments from the damaged side mirror had already been removed. Additionally, blood samples found on the front passenger seat, the interior driver's door, and the hood of Rowland's car matched appellant's DNA.

Appellant took the stand in both the guilt-innocence phase and the punishment phase of the trial. In the guilt-innocence phase, appellant admitted to being at the bar with Carroll and Matala and to ordering drinks for Rowland and her friend. He denied speaking to Rowland or making any lewd gestures at her. Appellant testified that Lewis started the fight and that he got punched and kicked in the head during the fight. Appellant testified that he was told that the police had been called and stayed outside the bar waiting for them. He also testified that he called the Fort Bend County Sheriff's Office even though the offense occurred in Harris County. Because the police did not arrive while he was waiting and because Carroll and others were urging him to leave, appellant finally left.

Appellant testified that Carroll drove them home, that it only took about 10 to 15 minutes to get home, and that he was thinking about how he was ashamed and

4

embarrassed during the ride home. He testified that during the ride home he heard a thud, Carroll asked what the sound was, and he said he didn't care and to go home. Appellant later attributed this unknown sound to the damage to his door and side mirror.

Appellant repeatedly asserted that he never attacked Rowland. He could not explain, however, how blood found at the scene of the crime matched his DNA. During his testimony, the following exchange took place:

Q. When you say you don't have an explanation or an answer to questions like what happened to your door or what happened to Ms. Rowland other than what we know here because of the trial, or how your DNA could have possibly gotten into her car, are you being truthful when you make those statements?

A. Yes, ma'am.

Q. Are you trying to hide behind intoxication or a faulty memory?

A. No, ma'am.

Q. Are you trying to hide behind any injuries you may have sustained that night?

A. No, ma'am.

Q. You're saying that because you don't know the answers to those questions, correct?

A. That's correct.

During the trial, an audio recording was admitted into evidence containing appellant's statement to police about four days after the incident. In that statement, appellant said he was jumped at the bar but insisted that he did not talk to any girl other than his girlfriend. He also said that they drove his girlfriend's Toyota to the bar and back to his place and that his BMW was at home the entire time. He told the officer that they drove straight to his apartment. He admitted that his BMW was in the shop for repairs but said it was because some kids had thrown something at the car around dusk time the previous Saturday. He identified a movie that was playing on a television station when he got home. Finally, he said he showered and went to bed.

Carroll and Matala testified for appellant as well. Their testimony corroborated the testimony of appellant. Matala testified that appellant did not make any crude gestures or comments to Rowland and that Lewis started the fight. Carroll testified

5

similarly, adding that she drove appellant directly to his home and that appellant never attacked Rowland.

The jury found appellant guilty of aggravated assault. During the punishment phase, appellant again testified, and the following exchange took place:

Q: And what do you do as far as—or do you do any volunteer work or community work with churches or anything like that?

A: Yes, ma'am. Back when I was—I used to fight, kickboxing. I've held some—I fought for a world title in 2000 in Canada, ISKA world title kickboxing. I hold the southwest Texas kickboxing title. I hold the Texas kickboxing title and I hold the U.S. kickboxing title, full contact.

I wanted to pass that along....

The jury assessed punishment at 18 years' confinement.

After the trial, appellant obtained new counsel and filed a motion for new trial, arguing he had received ineffective assistance of counsel. Appellant argued that he received ineffective assistance of counsel due to her failure to investigate and present testimony that appellant "suffers from a mental illness, disease, or defect that may have prevented him from forming the requisite culpable mental state to commit aggravated assault" and "that minimized his moral blameworthiness."

At the hearing, appellant's counsel presented the affidavits of appellant's trial counsel, appellant, a psychiatrist, and a neuropsychologist. Appellant's trial counsel, Kennitra Foote, stated in her affidavit:

When I prepared for trial, I did not know that [appellant] might suffer from a mental illness or defect. I had no way of knowing this information, nor was it reported to me that [appellant] had a history of head trauma and dementia. Had I known that information and recognized the possibility that his mental health could be relevant to guilt-innocence and/or punishment, I would have had him evaluated before trial by a mental health professional. I neither hired a mental health professional to evaluate him nor presented evidence at trial regarding his mental health. My failure to conduct this investigation and present this evidence was not strategic.

Appellant stated in his affidavit:

Ms. Foote did not ask me before trial about my mental health history or if I had a history of head injuries, nor did I have any reason to volunteer this information. Had she asked, I would have told her that I have an extensive history of closed head

6

injuries from years of kickboxing . . . .

The psychiatrist, Dr. A. David Axelrad, described in his affidavit the relevant information provided to him in an interview with appellant. In that interview, appellant told Dr. Axelrad that he had a history of significant alcohol use starting from the age of 12 or 13 and that there is a history of alcohol abuse in his family. He also told Dr. Axelrad that he began training in kickboxing in 1994 and began competing. During that time, he suffered three concussions "and he would frequently sustain closed head injuries during the course of this experience."

Dr. Axelrad noted in his affidavit that appellant was significantly intoxicated and received blows to the head on the night of the assault. Dr. Axelrad also stated in his affidavit:

It is to be noted that [appellant] has no memory for [sic] any of the events involved in the commission of the offense of Aggravated Assault against . . . Rowland. [Appellant] did testify in both the guilt and punishment phases that he has no memory of being involved in the commission of the aggravated assault against . . . Rowland.

Dr. Axelrad reported in his affidavit that appellant "has experienced significant problems with his memory over the course of the last several years."

Dr. Axelrad concluded that appellant "is mildly impaired as a result of his underlying psychiatric disorders" but also concluded that any further diagnosis would require a psychological evaluation by a neuropsychologist.

The neuropsychologist, Dr. Larry Pollock, noted appellant's history of head trauma but made no mention of appellant's history of alcohol abuse. Dr. Pollock stated in his evaluation:

[Appellant] was suffering from Chronic Traumatic Encephalopathy associated with years of kickboxing before the events in question. My evaluation also indicated that he suffered an Acute Traumatic Brain Injury and Post–Traumatic Amnesia immediately before the alleged offense. Post–Traumatic Amnesia is the result of trauma to the brain and involves a significant alteration in consciousness, impaired cognitive functioning, and memory loss. Consequently, Post–Traumatic Amnesia disrupts rational, goal-directed behavior and causes disinhibition of neurological regulation of behavior.

Dr. Pollock concluded that, because of these impairments, appellant was not "capable of forming the requisite culpable mental state to commit an aggravated assault. It is possible that, because of his mental condition at the time of the events in question,

he engaged in the alleged conduct but truthfully does not remember having done so."

Dr. Axelrad provided a subsequent affidavit where he stated that he had reviewed Dr. Pollock's report, discussed it with him, and agreed with his conclusions. He also stated, "I conclude that, within reasonable medical probability, [appellant] did not act intentionally or knowingly when he engaged in the alleged conduct. I do not believe that he was capable of forming the necessary culpable mental state to commit an aggravated assault."

The trial court denied the motion for new trial, finding, among other things, that Foote did not have any indication that appellant had any sort of mental health issue and that the testimony of appellant regarding the events of the night in question were clear and concise, as was appellant's statement to the police. The trial court also noted that appellant's testimony regarding the events of the night were corroborated by the testimony of Carroll and Matala.

*Amaya v. State*, 01–09–00848–CR, 2011 WL 1529732, at **1-4 (Tex. App.—Houston [1st Dist.]

2011, pet. ref'd, not designated for publication).

## III.   The AEDPA Standard of Review

Under 28 U.S.C. § 2254(d), a federal court may grant a habeas writ for a defendant convicted

under a state judgment only if the state-court adjudication of the defendant's constitutional claim

(1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court,

(2) "'involved an unreasonable application of'" clearly established Supreme Court precedent, or (3)

"'was based on an unreasonable determination of the facts' in light of the record before the state

court." *Harrington v. Richter*, 562 U.S. 86, 100–101 (2011) (quoting *Williams v. Taylor*, 529 U.S.

362, 412 (2000)); 28 U.S.C. § 2254(d). The AEDPA "bars relitigation of any claim 'adjudicated on

the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)."

*Id.*, 131 S. Ct. at 784 (2011). Under those provisions, "a federal court cannot grant a petition for a

writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved

an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S.

370, 390 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Similarly, federal courts defer to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Amaya is representing himself. A habeas petition filed by an unrepresented inmate is construed liberally and not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This court broadly interprets Amaya's state and federal habeas petitions. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## IV.     The Claims of Ineffective Assistance of Counsel

### A.     The Legal Standard

An ineffective assistance of counsel allegation in a § 2254 motion is analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail, Amaya must demonstrate that his counsel's performance was both deficient and prejudicial. *Strickland*, 466 U.S. at 687.  He must

show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001).

Counsel's performance is constitutionally deficient if it falls below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  In reviewing an ineffectiveness claim, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight." *Id.* at 689.  An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.*

The prejudice element requires Amaya to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  If the movant fails to prove one prong of the *Strickland* test, it is not necessary to analyze the other. *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one.").  "Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim." *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997).

In the context of ineffective assistance during the punishment phase of a state trial, the relevant inquiry is whether, absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been "significantly less harsh," *Spriggs v. Collins*, 993 F.2d 85, 88-89 (5th Cir. 1993), taking into account "such factors as the defendant's actual sentence, the

potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *Id.* at 88. *See also Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008).

Under AEDPA, this court's task is to assess whether the state court was reasonable in denying Amaya's *Strickland* claims. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010); *Harrington v. Richter*, 562 U.S. 86, 105 (2011). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." 562 U.S. at 101 (quotation omitted). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly so.'" *Richter*, 562 U.S. at 105; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## B.   The Claim that Trial Counsel Failed to Have a Psychiatric Expert Witness Testify

Amaya faults Foote for failing to present psychiatric experts in his defense. (Docket Entry No. 39-5, pp. 4-10). Amaya asserts that these expert witnesses would have testified that he did not have the mental capacity to be proven guilty. Amaya argues that Foote recognized that Amaya suffered from some form of mental impairment that produced forgetfulness, and that she should have taken it on herself to perform the required independent investigation into Amaya's mental health. Foote's awareness of Amaya's problem is shown by this part of her closing argument:

> He was traumatized. I don't know what was the trigger. Whether it was the alcohol, the trauma to the head, the beating. Nobody knows. He may not even know. To this day, he says he doesn't recall. That may actually be the truth. We don't know. Things happen. There are medical conditions that cover that.

11

Amaya maintains that Foote knew or should have known that he had some type of medical condition affecting his memory.

As with any claim of ineffective assistance, the reasonableness of counsel's investigation is assessed in light of all relevant circumstances. One relevant circumstance is the information that the defendant has provided trial counsel. As the Supreme Court noted in *Strickland*, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," because

> [c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

466 U.S. at 691.

The information the defendant provides to counsel is, however, not dispositive. *Strickland* did not create a rule that defense counsel's duty to investigate begins and ends with information gleaned from the defendant. That kind of inflexible rule is inconsistent with *Strickland's* requirement for case-by-case consideration. A lawyer's decisions on whether and what to investigate must be reasonable in light of all the relevant circumstances:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

counsel has a duty to make reasonable investigations or to make a reasonable
decision that makes particular investigations unnecessary. In any ineffectiveness case,
a particular decision not to investigate must be directly assessed for reasonableness
in all the circumstances, applying a heavy measure of deference to counsel's
judgments.

*Id.* at 690-91; *see also Rompilla v. Beard*, 545 U.S. 374, 383 (2005)("[R]easonably diligent counsel

may draw a line when they have good reason to think further investigation would be a waste.").

In her affidavit, Foote testified as follows:

When I prepared for trial, I did not know that Mr. Amaya might suffer from a mental
illness or defect. I had no way of knowing this information, nor was it reported to me
that Mr. Amaya had a history of head trauma and dementia. Had I known that
information and recognized the possibility that his mental health could be relevant
to guilt-innocence and/or punishment, I would have had him evaluated before trial
by a mental health professional. I neither hired a mental health professional to
evaluate him nor presented evidence at trial regarding his mental health. My failure
to conduct this investigation and present this evidence was not strategic.

(Docket Entry No. 39-15, p. 6).

Amaya raised this issue on appeal. The Texas appellate court rejected the claim, stating:

The record does not establish the extent and details of Foote's pretrial investigation.
Instead, we know only that Foote did not discover, in the course of her investigation,
the alleged mental impairment diagnosed by Dr. Axelrad and Dr. Pollock. Foote only
stated in her affidavit that she did not know that appellant "might suffer from a
mental illness or defect" and that it was not reported to her that he "had a history of
head trauma and dementia." Appellant stated in his affidavit that Foote did not ask
him about his mental health history or if he had a history of head injuries. We do not
otherwise know what actions Foote took to determine that further investigation into
appellant's mental health was not necessary.

Because we do not have any details of the investigation performed by Foote, we must
follow the "strong presumption that counsel's conduct falls within the wide range of
reasonable professional assistance." *Strickland*, 466 U.S. at 689. We can only find
Foote ineffective by finding that any reasonable investigation should have uncovered
the relevant evidence. *See Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App.
2006). In *Purchase*, we held that there was no requirement that counsel must always
ask a defendant about his psychiatric history when there are no indicators of possible
incompetency. *Purchase v. State*, 84 S.W.3d 696, 700–01 (Tex. App. - Houston [1st

Dist.] 2002, pet. ref'd). In that case, Purchase was found guilty of felony theft. At the hearing on the motion for new trial, Purchase's psychiatrist testified that Purchase had been previously diagnosed with adjustment disorder with depressed mood and anxiety symptoms and that Purchase was taking prescribed antidepressants for the condition. *Id.* at 699. Purchase testified that he was not taking his medication during the trial. *Id.* Purchase's doctor testified that failure to take the medication would have affected Purchase's mental state and his ability to communicate with his attorney. *Id.* at 699–700. Purchase's trial attorney testified that he did not have problems consulting with Purchase during the trial and he never believed Purchase was incompetent to stand trial. *Id.* at 700.

In the opinion, we noted that there was no evidence that Purchase's attorney knew of any factors that might have prompted further investigation into appellant's competency. *Id.* Instead, Purchase appeared competent and his attorney was not informed that he was on medication or under a psychiatrist's care. *Id.* We held that Purchase failed to establish that he had received ineffective assistance of counsel. *See id.* at 701.

In this case, there is no evidence that there were any indicators that would suggest that appellant's mental history would be relevant to the case. Foote stated that she did not know that appellant might suffer from a mental impairment and appellant stated that Foote did not ask him about his mental history. There is no indication that appellant or anyone else was aware at that time that appellant might have a mental impairment. Nothing in the record shows that, prior to appellant's post-trial diagnosis, appellant had ever been diagnosed with any mental impairment or was aware of it himself. Accordingly, even if we were to accept as true appellant's statement that Foote never asked him about his mental history, there is nothing to suggest that this would have been a fruitful inquiry.

Appellant argues that even if he had told Foote that no evidence existed to support a claim that he was suffering from a mental impairment, Foote still had a duty to conduct an investigation to determine whether this evidence existed. This is too broad a statement of Foote's duty. An attorney is not allowed to rely exclusively on the client's version of events without performing some independent investigation. *See, e.g., Ex parte Ewing,* 570 S.W.2d 941, 947 (Tex. Crim. App. 1978). On the other hand:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... And when a defendant has given counsel reason to believe that pursuing certain

investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland,* 466 U.S. at 691, 104 S. Ct. at 2065. As we have already stated, the only evidence presented is that Foote did not uncover appellant's alleged mental impairment in the course of her investigation and that appellant never told Foote about his mental health history or his history of sustaining closed head injuries. There is no evidence that Foote did not perform any investigation.

Furthermore, assuming without deciding that appellant has the mental impairment diagnosed by Dr. Axelrad and Dr. Pollock, there is no evidence that appellant exhibited the characteristics of the impairment in front of Foote or that appellant's description of the events relevant to the assault would have suggested a mental impairment to Foote.

Dr. Axelrad asserted in his affidavit that appellant testified in both the guilt-innocence and punishment phases of trial that he had no memory of being involved in the commission of the aggravated assault. Appellant makes a similar assertion in his brief. We disagree, however, with this characterization of appellant's testimony.

Appellant testified at trial about the details of the events on the night in question. While appellant testified that he could not remember certain specific details about the night due to being "out of it" after getting beat up in the bar, he never testified that he could not remember significant portions of any part of the night. In fact, he provided details of what he remembered from the moment he was at the bar to when he went to bed. Instead of testifying that he did not remember attacking Rowland, he repeatedly asserted that he did not attack Rowland. Appellant further clarified that he was not "trying to hide behind intoxication or a faulty memory" and that there was no possible way that he committed the assault against Rowland.

Likewise, in his statement to the police four days after the incident, appellant said he was jumped at the bar but insisted that he did not talk to any girl other than his girlfriend. He also said that they drove his girlfriend's Toyota to the bar and back to his place and that his BMW was at home the entire time. He told the officer that they drove straight to his apartment. He admitted that his BMW was in the shop for repairs but said it was because some kids had thrown something at the car around dusk the previous Saturday. He identified a movie that was playing on a television station when he got home. Finally, he said he showered and went to bed.

Additionally, Carroll's and Matala's testimony corroborated the testimony given by appellant. Their testimony specifically excluded any possibility that appellant harassed Rowland at the bar or assaulted her afterwards. Accordingly, Foote would

not have had reason to believe, based on appellant's, Carroll's and Matala's recounting of the events in question, that appellant was exhibiting any mental impairment that night.

Appellant argues in his brief that there were two indicators that should have suggested to Foote that appellant might suffer from a mental impairment: (1) "she was obviously on notice that [appellant] was a long-time kick-boxer" and (2) "there was nothing in his past to indicate the random violence presented by the facts of this case." Addressing the second point first, we fail to see how the lack of a history of violence would suggest a mental impairment while a history of violence would not. To the degree that appellant argues that any act of violence—whether a solitary act or one in a history of such acts—automatically raises a suggestion of a mental impairment precluding the offender from forming the requisite mental state, we decline to create such a rule.

Appellant testified at the punishment hearing that he held the full contact kickboxing title for Southwest Texas, Texas, and the United States. He also testified that he competed for the world title in 2000, but lost. Assuming without deciding that we can impute Foote with this knowledge prior to trial,[2] we cannot conclude that any failure by Foote to do further investigation based on this information would constitute ineffective assistance of counsel. In *Purchase* we held that "we will not now begin creating a list of mandatory questions that must be asked of defendants regardless of the circumstances surrounding the legal representation." 84 S.W.3d at 701. We decline to hold that failure to investigate whether a person trained and competing in martial arts is suffering from a mental impairment constitutes conduct "so outrageous that no competent attorney would have engaged in it." *Shanklin v. State*, 190 S.W.3d 154, 160 (Tex. App. - Houston [1st Dist.] 2005), *pet. dism'd improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007).

2    Appellant volunteered this information upon being asked by Foote whether he did any volunteer work with churches.

Appellant also compares his situation to the facts in *Gonzales*. In *Gonzales*, the defendant was convicted of capital murder. 204 S.W.3d at 393. In a writ of habeas corpus proceeding, Gonzales sought to establish that his trial counsel was ineffective for failing to uncover the extensive physical and sexual abuse he suffered as a child. *Id.* at 394. It was established that the abuse he experienced caused him to suffer from post-traumatic stress disorder. *Id.* It was also established that, while Gonzales's attorney talked to Gonzales, his mother, and his sister, the attorney did not ask about any specific topics. *Id.* Instead, the interviews were only global in nature. Gonzales' attorney later stated that he should have "at least inquired" into Gonzales' background and that it was a mistake on his part not to do so. *Id.* at 395. The Court of Criminal Appeals agreed, holding that, considering Gonzales's attorney's

constitutional and statutory obligation to present mitigating evidence during the punishment phase of a capital murder trial, the attorney was expected to have inquired whether Gonzales has been abused as a child. *Id.* at 397.

We believe a number of factors distinguish *Gonzales* from this case. First, it was established that Gonzales's attorney only asked Gonzales, his mother, and his sister global questions, without asking about any specific topics. *Id.* at 394. Second, it was established that this information was readily available to the attorney from the people he already had access to. *Id.* Third, the Court of Criminal Appeals emphasized that its holding concerned capital murder cases specifically. *Id.* at 397 (holding "[w]e think that, at the time of the applicant's trial, an objective standard of reasonable performance for defense counsel *in a capital case* would have required counsel to inquire whether the defendant had been abused as a child") (emphasis added). None of these critical factors are present in this case.

Because we do not know the extent of the actual investigation performed by Foote and must follow the strong presumption that her investigation was reasonable, because nothing in the record suggests that Foote should have been aware that appellant ever suffered from a mental impairment, and because nothing in the record shows that an investigation into appellant's mental history at that time would have suggested that a neuropsychological evaluation would be necessary or useful, we hold that the trial court did not abuse its discretion in overruling appellant's motion for new trial based on a claim of ineffective assistance of counsel.

We overrule appellant's two points of error.

*Amaya v. State*, 01–09–00848–CR, 2011 WL 1529732, at *5-9 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd, not designated for publication).

Amaya did not reveal to Foote, and the record does not show that Foote otherwise knew, that Amaya had a mental impairment. There was no documented history of it. Given the information she had, it was reasonable for Foote to conclude that having Amaya undergo a neuropsychological evaluation was unnecessary.

Amaya asserts that his impairment affected his ability to recall. But he did not tell Foote or testify that he could not remember details of the night in question or the assault. Amaya testified that he had a few drinks that night and was "feeling good." Amaya acknowledged that the bar receipt

showed that he bought a total of 22 drinks that night. (Docket Entry No. 14-20, p. 19). He testified that he was "jumped" at the bar, that he was beaten, and that he had several injuries that left him bloody and slightly dazed. He testified that he had to be helped off the floor after the attack in the bar, and that his girlfriend drove him home when he could not drive because of his injuries. Despite the injuries, Amaya was able to give a detailed account of his actions from the time he left the bar until he went to bed that night. This is consistent with Foote's statements that she did not know of memory issues rising to the level of, or reflecting, a mental impairment that needed evaluation.

Amaya fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. Amaya is not entitled to federal habeas corpus relief on this claim, and it is dismissed.

### C.    The Claim that Trial Counsel Failed to Call Favorable Witnesses

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). To prevail on an ineffective assistance claim based on an uncalled witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id.* *Strickland's* prejudice element requires Amaya to show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

The record evidence of Amaya's guilt was overwhelming. The record shows that Dawn

18

Rowland and a friend were ordering a drink from the bar at West End Pub when Amaya bought them a round of shots. (Docket Entry No. 14-16, Reporter's Record, Vol. II, pp. 18, 19). Rowland declined the shots and joined her group of friends in another area of the bar. (*Id.* at 20). For the rest of the night, Amaya harassed Rowland by moving closer to her group and making lewd comments and vulgar gestures. (*Id.* at 20, 21). Amaya would say "F you" and hold two fingers by his mouth and stick out his tongue. (*Id.*). Rowland was upset by Amaya's actions and complained twice to Rob Power, the bar owner, that Amaya was bothering her. (*Id.* at 22, 23). Another man, Michael Lewis, a friend of Rowland's, asked Amaya to pay his tab and leave the bar. (Docket Entry No. 14-18, Reporter's Record, Vol. III, p. 104). Amaya briefly fought with Lewis, then left the bar.

Erskin Hawkins was in the bar when the fight broke out between Lewis and Amaya. (*Id.* at 128). As he was leaving after the bar closed, Hawkins heard tires screeching and saw a silver or gray BMW "shoot through" the parking lot behind Dawn Rowland's car. (*Id.* at 135). A female was driving the BMW, and Amaya was in the passenger seat. (*Id.* at 136).

Rowland and her friend, Andrea Hunsucker, left the bar parking lot in separate vehicles. A car swerved behind Rowland's vehicle and followed her. (Docket Entry No. 14-16, Reporter's Record, Vol. II, p. 27). When Rowland and Hunsucker arrived at her friend's house, Rowland parked behind Hunsucker. (*Id.* at 78). A man who Rowland later identified as Amaya approached her driver's side window and smashed it with what she believed to be a crowbar. (*Id.* at 28). Amaya swung the crowbar inside the vehicle, striking Rowland on the side of the face. (*Id.* at 28, 29). Rowland crawled to the passenger seat and escaped through the passenger-side window. (*Id.* at 29). Rowland tried to run away, but Amaya hit her in the knees. (*Id.* at 29). She fell. As Amaya continued to hit her with the crowbar, he said, "how does it feel?" and "this is how it feels." (*Id.* at

30).  Amaya hit Rowland over 20 times with the crowbar. (*Id.* at 30).

Rowland was taken to the hospital, where she remained for five days. (Docket Entry No. 14-16, Reporter's Record, Vol. II, pp. 35, 36). Rowland needed ten stitches in her forehead, had bruises and lacerations on her head, a shattered hand that required surgery, three broken ribs, and a punctured lung. (*Id.* at 36). When she was released from the hospital, Rowland found blood on the inside of the driver's side-door handle of her vehicle, blood that she knew was not hers. (*Id.* at 38).

Colby Van Cleave lived on the street. He was leaving his bedroom when Hunsucker ran to the back door yelling, "He's killing her." (*Id.* at 100). Van Cleave ran out of his house and saw a silver BMV speeding away. (*Id.* at 106). Van Cleave threw a brick at the BMW as it passed, hitting the windshield and side mirror. (*Id.* at 105). The mirror broke off and was later picked up from the street. (*Id.* at 114).

Rowland recognized the man beating her as the same man who had been harassing her at the West End Pub because of distinctive white markings in his hair. (*Id.* at 31, 32). Amaya has vitiligo, a condition that causes pigmentation loss. (Docket Entry No. 14-20, Reporter's Record, Vol. IV, p. 107). Hunsucker also recognized Amaya as the same man who was bothering Rowland in the bar earlier that night. (Docket Entry No. 14-18, Reporter's Record, Vol. III, p. 83).

Deputy R.J. Lecompte retrieved Amaya's credit card information from the bar owner. (Docket Entry No. 14-18, Reporter's Record, Vol. III, pp. 23, 26). Deputy Russell Coleman, who did the follow-up investigation, made a photo spread that included Amaya's picture. (*Id.* at 42, 43; Docket Entry No. 15-10, Reporter's Record, Vol. VII, State's exhibit 125, pp. 4-6). Rowland identified Amaya from the photo spread as the man who attacked her. (Docket Entry No. 14-18, Reporter's Record, Vol. III, pp. 47, 48). Coleman traced a silver BMW registered to "Reynaldo

20

Amaya" to the Apollo Paint & Body, where there was a work order for a new right-side mirror and door. (*Id.* at 57, 60, 64; Docket Entry No. 15-10, Reporter's Record, Vol. VII, State's exhibit 127, pp. 16-38). The mirror recovered from the scene of the assault matched the damage to the silver BMW at Apollo Paint & Body. (Docket Entry No. 14-18, Reporter's Record, Vol. III, pp. 75, 76).

Blood samples taken from Rowland's vehicle were compared to buccal swabs collected from both Amaya and Rowland. (*Id.* at 66, 153, 188, 189, 216; Docket Entry No. 15-10, Reporter's Record, Vol. VII, State's exhibit 153, pp. 60-62, State's exhibit 160, pp. 82-89). Amaya's DNA matched the blood found on Rowland's front passenger seat and the interior driver-side door. (Docket Entry No. 14-18, Reporter's Record, Vol. III, pp. 188, 189, 216; Docket Entry No. 15-10, Reporter's Record, Vol. VII, State's exhibit 153, pp. 60-62, State's exhibit 160, pp. 82-89). In short, physical evidence as well as eyewitness testimony provided ample evidence of Amaya's guilt.

Amaya alleges that Foote's failure to call several witnesses at trial affected the trial outcome. The first witness is Jared Solis. In an affidavit, Solis stated:

1. That on October 4, 2008, I was employed as a bartender at the West End Pub and witnessed/state the following.

2. That Reynaldo Amaya did purchase shots from me and not Robert Powers.

3. That the reason Reynaldo Amaya purchased the shots were so I would take them to another patron, Dawn Rowland, for the sole purpose of lifting her shirt once again to allow her female friend to lick her breasts again.

4. That I did, in fact, witness an assault by two or three African American males against Reynaldo Amaya.

5. That on a scale from 1 to 10, the severity of the assault was an 8 and 9.

6. That I assisted in stopping the assault and helped Reynaldo Amaya up on to a barstool.

21

7. That Reynaldo Amaya's face was bloody and swollen, and that he sustained injuries.

8. That I witnessed where Reynaldo Amaya was sitting in the pub a few feet away from the bar and not within talking distance of Dawn Rowland.

9. That I witnessed Dawn Rowland mostly sitting at the bar and to my knowledge she was not being followed, stalked, or harassed by Reynaldo Amaya.

10. That I did not witness Reynaldo Amaya yelling obscenities, making lewd gestures or using vulgar language towards/at Dawn Rowland.

11. That it was in fact Dawn Rowland yelling obscenities towards Reynaldo Amaya and giving him the middle finger at him.

12. That Reynaldo Amaya had closed out his tab and was waiting for his friend (Manny) to close his tab so they could leave.

13. That I witnessed Reynaldo Amaya leave the pub with the one female he was with at the pub.
. . .

(Docket Entry No. 39-15, pp. 83-84).

Solis's testimony was very similar to Amaya's account of events in the bar on the night of the assault. Solis's testimony does not relate to the actual assault on Rowland after they left the bar. Rather, Amaya seeks to show that because Rowland was lying about what happened at the bar, she was lying about the assault itself. Foote cross-examined Rowland, questioning her about how much alcohol she had and whether she had exposed her breasts or other lewd acts. On redirect, Rowland testified that she was lifting up her shirt to show her stomach and did not remember exposing her breasts, but she may have. (Docket Entry No. 14-16, pp. 66-67). The jury assessed Rowland's credibility in light of the evidence. Given the evidence against Amaya, there is no basis to infer that, but for counsel's failure to call Jared Solis as a witness, the result of the proceeding would have been different. This claim is dismissed.

22

Amaya alleges that Foote was ineffective for failing to review Manuel Matala's testimony in advance, because of his poor English. In his affidavit, Manuel Matala stated:

1. That I am a native of the Philippines.
2. That at times I have difficulties processing and expressing the English language.
3. That my difficulties with processing and expressing the English language are enhanced when I am under duress, stress, nervous, etc.
4. That had Ms. Kennitra Foote contacted me prior to Reynaldo Amaya's trial to advise me of the process, I may have been better prepared and more at ease answering all of the questions from Ms. Foote and the District Attorney.

(Docket Entry No. 39-17, p. 42).

Matala testified that Amaya did not make crude gestures or comments to Rowland and that Lewis, not Amaya, started their brief fight. Matala's testimony corroborated Amaya's account of the events in the bar on the night of the assault. But again, given the overwhelming evidence of guilt, Amaya has not shown that had Foote practiced the testimony and perhaps made it easier for the jury to understand him, Matala's testimony would have led to a different result. This claim is dismissed.

During the punishment phase, the prosecution presented evidence of a vehicle accident involving Amaya driving his gray BMW, and Craig and Keisha Grigsby, driving a red SUV. The prosecution argued that Amaya caused a serious traffic accident while out on bond on the aggravated assault charge. The prosecution sough to show that Amaya was unable to abide by his bond conditions, was a danger to society, and should not be given probation. The prosecution presented an eyewitness, Denise Cotton, who saw Amaya speeding and hit a red SUV, causing it to roll over several times.

An eyewitness, Claude Eldridge, gave the following affidavit:

23

1. That on February 25, 2009, at approximately 10:30 p.m., I was traveling southbound on I-45 when I saw a red Ford Explorer on the far right hand shoulder with its hazard lights on.

2. That I made a u-turn at Rankin Road and proceeded northbound on I-45 noticing the red Ford Explorer vehicle was still there. I proceeded down to FM. 1960, made a u-turn, and entered I-45 traveling southbound again.

3. That in front of me were several vehicles, including a large 18 wheeler. I was approximately 30 to 40 car lengths behind the 18 wheeler traveling in the same lane.

4. That as I began to change lanes to the right for the stranded motorist (red Ford Explorer), I noticed the red Ford Explorer was leaving from the emergency lane from the far right side with its hazard lights turned off and proceeding to enter I-45. The 18 wheeler had just passed the Ford Explorer when the Ford Explorer entered onto I-45. The Ford Explorer did not use its turn signal when entering I-45.

5. That the Ford Explorer quickly crossed over three lanes of traffic causing the grey BMW to collide with the back of the Ford Explorer, causing the Explorer to travel sideways.

6. That the BMW slammed on its brakes coming to a stop in the far left hand lane. The Ford Explorer went sideways striking the guardrail causing it to rollover.

7. That I was the first person at the scene rendering help. I got out of my tow truck, and first ran to the Ford Explorer. There were two people inside when I got to the vehicle. The male was saying his hip was hurting and the female had a cut on her forehead.

8. That upon making contact with the Ford Explore and two occupants I did not smell any gas odor.

9. That once I realized the occupants of the Ford Explorer were okay, I ran across I-45 to the BMW. There was only one occupant in the BMW. The driver of the BMW had his head laid back on his seat headrest and was looking up. When I asked him if was he okay, he did not respond. I believe he was in shock from the accident due to it happening so fast and impact of the airbag which was deployed.

10. That Mr. Amaya was not speeding or driving erratically. He was on one lane

the entire time I was behind him.

11.  That I was traveling approximately 70-75 mph and catching up to Mr. Amaya[.]

12.  That after the collision, the BMW was not driveable and remained on the far left lane of traffic until I was able to tow it.

13.  That from what I witnessed, the Ford Explorer was at fault for the accident as it failed to signal its intentions, to enter I-45 and then crossed over three lanes quickly from a dead stop instead of one lane at a time, not allowing proper time and space for oncoming traffic.

14.  That I was never asked by the police or made any statements to the police regarding the accident involving the BMW and/or Ford Explorer.

15.  That I offered to give Officer Drake a statement; Officer Drake refused to take my statement.

16.  That I gave Mr. Amaya a brief statement (see attached) to give his attorney until their office contacted me, at which time I would have given all the details stated herein.

17.  That prior to the accident, I have never met Mr. Amaya.

18.  That I was never contacted by Ms. Foote (Mr. Amaya's attorney) or Ms. Foote's office and/or staff to testify on Mr. Amaya's behalf.

(Docket Entry No. 40-5, pp. 40-42).

Eldridge's statement about the February 25, 2009 automobile accident differs greatly from the account provided by the driver and passenger in the SUV, Craig and Keisha Grigsby, and by another eyewitness, Denise Cotton. This eyewitness testified that she was driving south on the Northwest Freeway when she saw a silver BMW driving erratically at an approximate speed of 90 miles per hour. She saw the silver BMW change lanes and strike a red SUV, causing it to roll over at least four times. She also saw the driver of the silver BMW get out of his vehicle and stand near it without going to check on the passengers of the red SUV.

25

The driver of the car Amaya hit, Craig Grigsby, testified that he was driving his red Ford Explorer on the Northwest Freeway when he saw a gray vehicle in his rear-view mirror. He testified that the gray car hit his SUV from behind, making it roll over several times. He lacerated his liver and had several bruises on his head and back. Keisha Grigsby, the passenger, testified that she did not remember anything about the accident. She broke bones in her neck and had injuries to her forehead, back, and leg. She was two months pregnant at the time. The State presented accident-reconstruction experts who determined, based on skid marks at the scene, that Amaya was driving at approximately 90 miles an hour.

Amaya accuses the Grigsbys of giving false testimony, suggesting that they were committing insurance fraud. No record evidence supports this. The record shows that Eldridge's testimony was not credible and that any benefit from Eldridge's testimony would be undermined by a skillful cross-examination. The record also shows that it was reasonable to conclude that any attempt to blame the Grigsbys for the accident and accuse them of fraud would have hurt Amaya's case. The record does not support an inference that the failure to call Eldridge to testify in the punishment phase would have altered the outcome.

Amaya also alleges that Foote should have called more of his sisters to testify during the punishment phase. He offers the affidavits of Estella Rodriguez, Sonia Herrera, Margarita Carnahan, and Francis A. Turner. All are identical in describing Foote's representation during trial as distracted, in accusing one of the State's witnesses of trying to intimidate them.

Estella Rodriguez and Sonia Herrera testified during the punishment phase on their brother's good character. Both Rodriguez and Herrera testified about their experiences growing up with Amaya and described him as a good brother, father, and son. They both denied that he assaulted

26

Rowland. They believed that Amaya should be sentenced to probation because he was not a danger to society. Amaya does not explain how calling two more sisters to give testimony cumulative to that offered by Rodriguez and Herrera would have changed the outcome.

Amaya asserts that his son, Reynaldo Amaya, III, should have been called to testify to support Amaya's claim that he was injured in the bar and to impeach Officer Perkins. This officer testified that, early on October 5, 2008, no one was at Amaya's home and that no vehicles were parked there. Amaya argues that Officer Perkins's testimony was perjured because Amaya had custody of both his sons the weekend of October 5, 2008, and that Reynaldo Amaya III's car and Amaya's SUV were both parked at Amaya's residence. Again, even if Amaya's car had been at the house for part of the early morning of October 5, that is not inconsistent with evidence of guilt. The ample evidence of guilt means that there is no reasonable basis to infer that Amaya III's testimony would have affected the trial outcome.

Amaya also alleges that if defense counsel had interviewed Eric Williams before he testified for Amaya, Williams could have testified about Amaya's prior involvement in kickboxing and mixed martial arts. Eric Williams was a long time friend. Even if Williams had testified about Amaya's martial arts history, Amaya does not explain why his punishment would have been less harsh.

Amaya argues that had Foote interviewed and presented a BMW brake expert as a witness, the jury would have been told that Amaya's BMW was equipped with a high-performance anti-locking braking system and would not have left long skid marks on braking. Amaya argues that this would have cast doubt on his vehicle's involvement in causing the SUV to roll over. (Docket Entry No. 46-1, p. 6). In light of the clear testimony by the eyewitness and the driver and passenger of the red Ford Explorer, and the evidence of the high-speed impact, it is unreasonable to infer that a brake

expert would have cast doubt on the witnesses' accounts of the BMW's speed and the impact with the red SUV. Amaya does not explain how the outcome of his trial would have been different if Foote had called a brake expert.

**D.      The Claim that Trial Counsel Failed to Interview Some of the State's Witnesses**

Amaya next claims that Foote acted ineffectively for not seeking out and interviewing the State's witnesses before trial. (Docket Entry No. 39-6, pp. 1-27, Docket Entry No. 39-7, pp. 1-27, Docket Entry No. 39-8, pp. 1-14; Docket Entry No. 39-10, pp. 17-24, Docket Entry No. 39-11, pp. 1-12). Amaya argues that the record contains no documentation of Foote's investigation or interview notes. He notes that the record contains an itemized list of trial counsel's file contents, and the list contains no such notes.

Government witnesses are not required to speak to or be interviewed by the defense before trial. *United States v. Benson*, 495 F.2d 475, 479 (5th Cir. 1974). Nothing in the record shows that the government witnesses were willing to talk to Foote or available to so. Nor does the record show any basis to infer that Amaya was prejudiced by Foote's inability or failure to interview the government's witnesses before trial. Amaya speculates that Foote would have been better prepared, but the record shows that she cross-examined each witness. Amaya does not explain how the outcome of his trial would have been different had Foote interviewed any, some, or all of the government witnesses before trial.

**E.      The Claim that Trial Counsel Failed to Conduct an Adequate Investigation**

Amaya claims that Foote acted ineffectively by not conducting an adequate pretrial investigation and not having a firm command of the facts of the case. (Docket Entry No. 39-8, pp. 14-28, Docket Entry No. 39-9, pp. 1-14). Under *Strickland*,

28

> [w]ith respect to the duty to investigate, strategic choices made after thorough
> investigation of law and facts relevant to plausible options are virtually
> unchallengeable; and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional judgments support
> the limitations on investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision that makes particular
> investigations unnecessary. In any ineffectiveness case, a particular decision not to
> investigate must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court has stated that these three post-*Strickland* cases, each of which granted relief on ineffective-assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 563 U.S. 170 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 789–90 (2011). Amaya's trial counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

Amaya's ineffective assistance claim fails because he has not identified evidence that shows deficient performance by counsel or prejudice to him. To establish prejudice based on counsel's failure to investigate, the petitioner "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)) (internal quotation marks omitted). Amaya does identify several areas he believes Foote should have investigated or done more to develop. He argues that Foote should have interviewed or contacted his previous attorney, filed more motions, investigated the "alleged DNA" found in Rowland's car,

followed up on inconsistencies in chain-of-custody affidavits, interviewed the government's witnesses, discovered that the car rear-view mirror found in the street where the assault occurred had been tampered with, and more. (Docket Entry No. 39-8, pp. 1-15, Docket Entry No. 39-9, pp. 1-14). But none of his arguments show what additional investigation would have uncovered or how his defense would have benefitted.

Amaya points to an inconsistency in the chain-of-custody affidavits. One affidavit describes 9 items collected for testing; the next affidavit describes 11 items collected. (Docket Entry No. 39-8, pp. 21-26; Docket Entry No. 40-4, pp. 43-46). Amaya argues that this shows "fabrication," "tampering," "perjury," and "corruption," and that his attorney should have filed a motion to suppress on this basis. Amaya does not point to any evidence of fabricated or altered evidence, or perjured testimony about the physical evidence submitted for testing. The respondent persuasively argues that the error is an administrative oversight and that a single chain-of-custody affidavit with the discrepancy identified is hardly proof of tampering or fabrication, or a basis for filing a motion to suppress because chain of custody affects only the weight of evidence, not its admissibility. *Davis v. State*, 313 S.W.3d 317, 348 (Tex. Crim. App. 2010).

The other discrepancies Amaya identifies are similar. He alleges that Foote should have noticed that the lab and police paperwork recorded his boot size as both "size 8" and "size 9," (Docket Entry No. 39-9, p. 3), and that Foote failed to find out how the brick one of the eyewitnesses threw at Amaya's car "got to the courthouse," "why it wasn't tagged and secured as evidence," and why "the brick was never tested for paint chip residue, nor was the mirror cover tested for brick residue." (Docket Entry No. 39-9, pp. 6-7). Again, Amaya fails to identify any basis to conclude that these discrepancies justified making, much less granting, a motion to suppress.

Amaya's claims of inadequate investigation are meritless because he cannot show the extent of Foote's investigation, nor can he show that his proposed avenues of investigation would have been beneficial to his defense. These claims are dismissed.

### F.   The Claim that Counsel Failed to Have a Firm Command of the Facts of the Case

Amaya alleged that Foote did not interview his previous attorney or try to retrieve his file from that attorney. (Docket Entry No. 39-9, pp. 14-16). There is no inflexible requirement for trial counsel to interview previous counsel or obtain his file, and nothing in the record shows why or how either step would have assisted Foote in preparing or presenting the case.

Amaya alleged that Foote met with him only twice before trial and did not provide an itemized billing statement. (Docket Entry No. 39-9, p. 16). Again, the amount of consultation time with a defendant does not establish a claim for ineffective assistance of counsel, unless the defendant can show specific benefits that would have resulted from more consultation time and how that would have changed the trial outcome. *Schwander v. Blackburn*, 750 F.2d 494, 499 (5th Cir. 1985). *See, e.g., Murray v. Maggio*, 736 F.2d 279, 282–83 (5th Cir. 1984) ("[B]revity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel."). Amaya fails to cite no basis to require trial counsel to spend more time with a client than Foote did with him or to provide itemized billing statements on demand. And Amaya makes no effort to identify how additional meetings or itemized statements would have helped his case, much less changed the outcome.

Amaya also alleged that Foote advised him to be "more focused on the felony charge [than the DWI charge]." (Docket Entry No. 39-9, p. 17; Docket Entry No. 39-15, p. 18). The greater

31

seriousness of, and the potentially more serious punishment range for, the felony charge make this advice reasonable.

Amaya alleged that Foote did not file discovery motions, motions to suppress, or motions to adopt discovery motions filed by his previous attorney. (Docket Entry No. 39-9, p. 17). But he fails to establish deficient performance because he does not specify what evidence should have been suppressed, what discovery should have been but was not conducted, or how added discovery or motions would have affected the trial outcome. Nor does he explain why there was a need to adopt motions filed by previous counsel.

Amaya also complained that Foote did not make a Rule 403 objection to the prosecution's introduction of a crowbar for demonstrative purposes only. (Docket Entry No. 39-9, pp. 18-22; Docket Entry No. 14-16, Reporter's Record, Vol. II, p. 33). The record shows that Foote did object:

> MS. BYRNE: Okay. At this time the State would offer State's Exhibit 1 for demonstrative purposes only, tender to defense counsel for inspection.
> THE COURT: Any objection to State's 1 as demonstrative purposes?
> MS. FOOTE: Yes, Your Honor. I object to it based on the fact that even though it is being presented for demonstrative purposes, there's been no testimony that would say that any type of object that even remotely looks like this is actually the object. She did say it was a blunt object, but that is, in fact, a crowbar and I would not want the jury to --
> THE COURT: Okay. I don't need a speaking objection. Your objection's overruled. State's 1 may be used for demonstrative purposes.

(Docket Entry No. 14-16, Reporter's Record, Vol. II, pp. 32-33).

This exchange undercuts Amaya's claim. Foote did object and the trial court found that the evidence could be used as demonstrative only. Any further objection would have been futile.

Amaya alleged that Foote viewed only a black-and-white copy of the photographic lineup, not a color copy, before objecting to it as suggestive. (Docket Entry No. 39-9, pp. 23-28; Docket

Entry No. 14-18, Reporter's Record, Vol. III, pp. 51-52).   Officer Coleman testified that the individuals in the photographic array were all Hispanic males, of roughly the same size and build, with some sort of moustache or facial hair, and with close to the same hair color.   *See* State's Exhibit no. 125. The respondent agrees that viewing the color copy would be the better practice, but argues that it was not necessary to see the color copy to make the objection.  The respondent argues that the fact that Amaya had an unusual physical characteristic–the white spots in his hair–was not enough to make the lineup impermissibly suggestive.

An identification procedure violates due process when it is "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *United States v. Atkins*, 698 F.2d 711, 713 (5th Cir. 1983) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).   A conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

A two-step process governs the admissibility of identification evidence.  The first step is to determine whether the pretrial identification was impermissibly suggestive.   If so, the court determines whether, "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990) (citing *Simmons v. United States*, 390 U.S. 377 (1968)).  "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses certain aspects of reliability." *See Neil v. Biggers,* 409 U.S. 188, 193 (1972). Courts look to the "totality of the circumstances" to determine whether an identification carries a

substantial risk of misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 113 (1977) (citing *Stovall,*

388 U.S. at 302); *Biggers,* 409 U.S. at 196. Courts use five factors to evaluate reliability:

> (1) the opportunity to view the criminal at the time of the crime; (2) the witness's
> degree of attention; (3) the accuracy of the witness's prior description of the criminal;
> (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the
> length of time between the crime and the confrontation.

*Biggers,* 409 U.S. at 199-200. "[R]eliability is the linchpin in determining the admissibility of

identification testimony." *Manson,* 432 U.S. at 114.

A review of the five *Biggers* factors supports the conclusion that the identification here was

reliable. The trial testimony shows that the complainant, Rowland, had ample opportunity to see the

side of her assailant's face at close range. Rowland did not see Amaya's face when he shattered her

car window with the crowbar, (Docket Entry No. 14-16, p. 60), but she did see his face while he was

hitting her with the crowbar. She testified to seeing the white markings in Amaya's hair. (Docket

Entry No. 14-16, p. 31).

The second factor, the witness's degree of attention, also supports finding a reliable

identification. Rowland paid close attention to her assailant while she tried to shield herself from

the crowbar. The record discloses nothing that would have distracted Rowland's attention.

The third factor is the accuracy of the witness's prior description of the assailant. It does not

appear that Rowland gave a description of her assailant before identifying Amaya from the photo

spread in the hospital.

The fourth factor, the level of certainty the witness demonstrates, also supports the reliability

of the identification. None of the officers suggested which individual Rowland should select from

the photographic array. Rowland identified Amaya as the assailant first, and with certainty.

34

The fifth factor is the length of time between the crime and the confrontation. The assault occurred on October 5, 2008. Police showed Rowland the photographic array on October 8, 2008. This supports finding reliability.

None of the *Biggers* factors support Amaya's arguments. Considering these factors and Fifth Circuit precedent, even if the photo line-up was suggestive, it created no substantial risk of misidentification. Foote was able to cross-examine Rowland about her identification, which gave the jury ample opportunity to evaluate her credibility and her identification in determining whether the evidence proved Amaya's guilt.

Amaya finally alleged that Foote was not prepared to object to the admissibility of an audio recording of Amaya's interview with a law-enforcement officer. (Docket Entry No. 39-9, pp. 28-29, Docket Entry No. 39-10, pp. 1-7; Docket Entry No. 14-20, Reporter's Record, Vol. IV, pp. 154–60). The prosecutor introduced an audio recording of a conversation between Officer Coleman and Amaya, in which Amaya stated that on the night of the offense, he was driving his Toyota Camry. (Docket Entry No. 14-21, Reporter's Record, Vol. IV, p. 3). While Foote did not articulate her *Miranda* objection to the exhibit as well as she might have, she did state the objection and its basis was clear. The judge overruled her objection. Amaya argues that the audio recording constituted an inadmissible custodial interrogation, but this argument ignores the fact that it was offered for impeachment purposes. *Miranda* does not bar introducing incriminating statements for impeachment purposes on cross-examination. *See Harris v. New York*, 401 U.S. 222 (1971).

Amaya has failed to establish that Foote's representation was deficient for lack of preparation or that the alleged deficiencies prejudiced his case. This claim lacks merit and is dismissed.

### G.   The Claim that Trial Counsel Failed to Sufficiently Object

Amaya claimed that Foote was ineffective by not making numerous objections during both phases of trial. (Docket Entry No. 39-10, pp. 8-14; Docket Entry No. 39-11, p. 24, Docket Entry No. 39-12, pp. 1-2).  The respondent argues that this claim is meritless, if not waived, because the objections concern trivial matters that are largely not objectionable and because the objections are in the form of charts with no explanation.

Amaya lays out in a chart dozens of objections he believes Foote should have made. He gives no explanation beyond categorizing them as "hearsay," "leading," "speculation," or the like. (Docket Entry No. 39-10, pp. 12-14, 23-24).  Even assuming that they are not waived for lack of explanation, *see Woods v. Cockrell*, 307 F.3d 353, 357 (5th Cir. 2002) (stating a legal conclusion, without a serious attempt to argue or substantiate it, waives or abandons the issue), they are without merit. Examining them individually and together reveals that they concern small points that could not have affected the outcome.

Amaya has not shown that Foote acted deficiently by failing to make the objections, that any would have likely been sustained, or that any would have affected the outcome.  This claim is dismissed.

### H.   The Claim that Trial Counsel Failed to Object to Extraneous-Offense Evidence During the Punishment Phase

Amaya claimed that Foote acted ineffectively by not objecting to the State's introduction of evidence that Amaya committed a DWI while on bond. (Docket Entry No. 39-11, pp. 20-24 (citing repeatedly to Rule 404 of the Texas Rules of Evidence)). This evidence was introduced in the punishment phase, under TEX. CODE CRIM PROC. ANN. art. 37.07, § 3(a)(1) (West 2009).  This

statute provides:

> (a)(1) Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

*Id.* Under this statute, there was no basis to object to the evidence. Failing to make a futile objection is not deficient performance. Amaya also complains that his counsel did not object to the State's failure to notify him of its intention to introduce evidence of extraneous offenses during punishment, but the record shows that the State did provide such notice. (Docket Entry No. 14-9, Clerk's Record, pp. 8-9). Amaya fails to establish that his counsel was deficient in failing to object. This claim is dismissed.

### I.   The Claim of Cumulative Error

Amaya argues that his ineffective assistance of counsel claims resulted in cumulative error warranting reversal. "[A]n aggregation of nonreversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). Federal habeas corpus relief is granted on the basis of cumulative errors only if they are of a constitutional dimension. *See Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (citation omitted); *see also Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993) (habeas relief is granted only when "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the

errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial the resulting conviction violates due process.'") (quoting *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc)).

Amaya has failed to establish any claim of ineffective assistance of counsel, defeating his cumulative-error claim. *See United States v. McIntosh*, 280 F.3d 479, 484 (5th Cir. 2002) (stating petitioner "has not established any error; therefore, there is nothing to cumulate"); *United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) (no cumulative error where defendant failed to identify a single error); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (petitioner who failed to demonstrate any error during trial could not establish cumulative error).  This claim lacks merit.

## V.     The Prosecutorial Misconduct Claims

### A.     The Claim that the Prosecutor Introduced Perjured Testimony and Fabricated Evidence

Amaya alleges that the prosecution "knowingly, intentionally, and maliciously allowed, and in many instances, led its witnesses to commit perjury and/or make false statements." (Docket Entry No. 39-12, pp. 3-7).

Amaya refers to the following testimony:

1.     Complainant's testimony about the amount of alcohol she consumed.

2.     Complainant's strong denial of lifting her shirt and allowing her friend to lick her breasts.

3.     Complainant's testimony about the injuries she sustained, the medical treatment, procedures, and the long-term effects of the injuries.

4.     Hunsucker's and Pride's testimony about seeing a weapon in the assailant's hand.

38

5.   VanCleave's testimony that he "chunked" a brick, State's Exhibit 3, and hit the BMW windshield, pillar, and mirror.

6.   Officer Perkins's falsification of an "official government form"–his police report–in which he stated that, "[t]here was also a side mirror from the suspect vehicle "found" in the grass between the above two listed residences."

7.   Officer LeCompte's falsification of an "official government form" and testimony that no one was at Amaya's home and only one vehicle was parked on the street on the morning of the assault.

8.   Detective Coleman's testimony that the individuals in the photo array have the "same hair color" and that there was "nothing unique or different about defendant's photograph . . . "

9.   Officer Glover's statement in an "official government form" that he was en route to process Rowland's vehicle for blood on the morning of October 14, 2008.

10.   Lewis's testimony that Amaya approached him and Rowland at the bar.

11.   Hawkins's testimony.

(Docket Entry No. 39-12, pp. 3-7).

Amaya's allegations of perjured testimony are based on what he asserts was contradictory testimony or prior inconsistent statements.  Neither proves perjury. *United States v. Neal,* 245 F.3d 790, 790 (5th Cir. 2000) (citing *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990) ("Contradictory testimony does not prove perjury."). Nor do Amaya's allegations establish a due process violation. *See Knox v. Johnson,* 224 F.3d 470, 477 (5th Cir. 2000) (quoting *Giglio v. United States,* 405 U.S. 150, 153 (1972)) (to prove a due process violation based on the prosecution's reliance on false testimony, the defendant must establish: "(1) that a witness for the State testified falsely; (2) that

39

such testimony was material; and (3) that the prosecution knew that the testimony was false."); *see also Napue v. Illinois*, 360 U.S. 264  (1959); *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010).  Amaya does not establish that the evidence was false, was material, or that the prosecution had knowledge that the evidence was false. His claims fail and are dismissed.

### B. The Claim that the Prosecutor Failed to Comply with the Court's Order Granting Discovery

Amaya alleges that "[t]he State failed to produce evidence for inspection and photocopying." (Docket Entry No. 39-12, p. 10). This claim is not supported by the record. Amaya's sister, Estella Rodriguez, stated that she retrieved a box of legal documents from Foote's office. (Docket Entry No. 39-17, pp. 48-50). This claim is conclusory.

Amaya also accuses the prosecution of not providing notice of intent to use various business records affidavits. (Docket Entry No. 39-12, p. 11). The clerk's record contains file-stamped copies of the notices,  (Docket Entry No. 14-7, pp. 57-58).  This claim lacks merit and it is dismissed.

### C. The Claim that the Prosecutor Presented Improper Closing Argument

Amaya alleges that "[t]he State knowingly and intentionally delivered an improper closing argument." (Docket Entry No. 39-12, pp. 11-14). A trial court has broad discretion to control closing argument. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App. – El Paso 2004, no pet.).  Proper jury argument is generally limited to: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) answers to opposing counsel's argument; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex. App. – Houston [1st Dist.] 2013, no pet.).

Amaya alleges that 12 parts of the prosecutor's closing were improper. Each part is analyzed

40

below.

1. "She's being asked whether she licked another woman's breasts."

Amaya argues that this statement is false and that no one testified that Rowland was licking

another woman's breasts. Amaya testified that Rowland's friend was licking the her breasts. "The

prosecution states only your Applicant saw and testifies to this, which is true, however, had Mr. Solis

been interviewed and advanced, he would have testified to seeing the same."

2. "She was honest with you though. She told you, Look, I'm not saying I didn't have more
to drink, but I'm telling you what I remember I had to drink."

Amaya argued that Rowland was not "honest" and made "many inconsistent, contradictory,

and perjured" statements. Amaya points out that after the prosecution asked Rowland's family to

leave the courtroom, she "somewhat" recanted her story about how much alcohol she had to drink.

3. "Michael Lewis admits . . . Yeah, I'm the only one who got good swings in Dawn didn't
ask him to do it."

Amaya stated that Michael Lewis changed his testimony about how many people besides him

fought with Amaya. Amaya noted that Rowland testified that she asked Lewis to remove Amaya

from the bar.

4. ". . . Ms. Carroll . . . kept changing her story."

Amaya alleged that, contrary to the prosecutor's statement, Carroll's story did not keep

changing. Instead, the prosecution's repetitive questions and harassment "confused" the issue.

Amaya's account of Carroll's testimony is that she and Amaya each drove to the bar and that is why

she stated that they drove her Camry.

5. ". . . He told you he was intoxicated. He was intoxicated. . ."

Amaya argued that he never testified that he was "intoxicated," and that "[f]eeling good" is

41

not "intoxicated."

6. ". . . he just happens to take his car to the shop the next day . . "

Amaya argued that, contrary to the prosecutor's statement, he did not take his car to the shop

the next day. Instead, Carroll took Amaya's car to the shop.

7. "As far as the brick, Mr. Foote said nobody had seen it before today. . . "

Amaya argues that when the prosecutor referred to Foote's statement that "nobody" had seen

the brick before trial, Officer LeCompte and Detective Coleman testified that they had not seen the

brick before trial, and that Officer Perkins only "photographed the scene." The prosecutor misspoke.

In fact, Foote was talking about what officers had seen. Perkins photographed the mirror cover and

the brick, but, according to Amaya, he collected the mirror cover as evidence and did not collect the

brick.

8.      "Didn't Dawn testify that when the man bashed her window with the crowbar, he
then started reaching trying to open the door. . ."

Amaya argued that Rowland's story kept changing as to what she remembered and saw, what

was allegedly used, and what the alleged assailant was doing.  Amaya asserted that no fingerprints

or blood were found inside Rowland's vehicle the night of the alleged assault, contrary to the

prosecutor's argument.

9. ". . . maybe Sherrie hit something. . ."

Amaya denied making this statement.

10. ". . . They didn't even all know each other. They don't socialize together outside of going
to the same pub."

Amaya argued that Hunsucker and VanCleave testified they were Rowland's friends and that

they did socialize outside the bar, contrary to the prosecutor's statement.

42

11. ". . . none of you checked your common sense at the door when you take that oath and decide to be jurors."

12. ". . . He's saying whatever he can up there to try to contradict everything we've put forward, but you just can't hide from it."

Amaya argued that the prosecutor's comments played to the jurors' passions and prejudices, making this argument improper. (Docket Entry No. 39-12, pp. 11-14). To determine whether a closing argument amounts to prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A trial is fundamentally unfair "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Riddle v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002) (internal quotation marks omitted).

The cited comments either summarize or argue reasonable deductions from witness testimony. Some of the statements Amaya cited singly reject the truthfulness of what the witnesses said. That is not a basis for error. Some of the statements Amaya cited as improper contained minor discrepancies from what Amaya asserted was true. *See*, e.g., 2, 3, 4, 5, 8. Whatever error existed was harmless in the context of the entire trial and the judge instructed the jury that the arguments of the prosecutor and defense counsel were not evidence. Jurors are presumed to understand and follow the court's instructions. *See United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008). This presumption can be overcome only when there "is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." *Id.* (quoting *United States v. Barksdale-Contreras*, 972 F.2d 111, 116 (5th Cir. 1992)). Amaya has offered no basis for rejecting the presumption that the jury understood and followed the court's

instructions. The record shows that the prosecutor made no improper remarks and that no improper prejudice casting serious doubt on the correctness of the jury verdict resulted. *United States v. Valencia*, 600 F.3d 389, 409 (5th Cir. 2010). This claim is dismissed.

### D.    The Claim that the Prosecutor Prevented the Complainant from Speaking to Amaya's Investigator

Amaya alleged that the prosecution prohibited Rowland from speaking to his investigator. (Docket Entry No. 39-12, p. 14). He cited his investigator's affidavit stating that Rowland told him "that she needed to check with her attorney before she could speak to anyone about the case." (Docket Entry No. 40-5, p. 15). Amaya offered no explanation for the assumption that Rowland's attorney was the prosecutor. There is no basis to conclude that the prosecution kept Rowland from speaking to defense counsel. This claim is dismissed.

### E.    Harmless Error

Even if the prosecution committed the alleged errors, they are harmless, considered individually and collectively. The evidence against Amaya was overwhelming. Amaya has not established a reasonable probability that the outcome of his trial would have been different had the prosecutor not engaged in the challenged conduct. These claims are dismissed.

## VI.    The Trial-Court Error Claims

Amaya asserted that the trial court erred in ways that made the proceedings against him unfair. A federal habeas court grants relief based on state-court errors only if the error is sufficiently egregious as to make the entire trial fundamentally unfair. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978 (1993). "A state court's evidentiary ruling presents a cognizable habeas claim only if it runs afoul of a specific constitutional right or renders the trial

44

fundamentally unfair." *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994), *cert. denied,* 513 U.S.

1163 (1995). The challenged evidence must be a crucial, critical, or highly significant factor in the

context of the entire case. *Jernigan v. Collins*, 980 F.2d at 298; *Bridge v. Lynaugh,* 838 F.2d at 772;

*Thomas v. Lynaugh,* 812 F.2d 225, 230 (5th Cir.), *cert. denied*, 484 U.S. 842 (1987).

A trial court error makes a trial fundamentally unfair only when there is a reasonable

probability that the verdict might have been different had the trial been properly conducted. *See*

*Guidroz v. Lynaugh,* 852 F.2d 832, 835 (5th Cir. 1988); *Rogers v. Lynaugh,* 848 F.2d 606, 609 (5th

Cir. 1988).

### A.    The Claim that the Trial Judge Failed to Follow Code of Criminal Procedure

Amaya alleged that the judge did not give him the opportunity to respond to the prosecution's

motion to amend the indictment, in violation of Article 28.10, and failed to specify the time, place,

and manner for discovery, in violation of Article 39.14(a). These claims are meritless. Article 28.10

allows the defendant to respond "on request of the defendant." Amaya made no such request. The

discovery order states: "[i]n the event that further particularized discovery is considered necessary,

the defense will thereafter file a written Motion of Discovery." (Docket Entry No. 14-5, p. 46).

Amaya did not file a motion. Amaya responds that he relied on Foote to file the appropriate motions,

but he does not explain how the Judge erred or how the outcome of his trial would have been

different if he had been allowed to respond to the amended indictment and to seek discovery. These

claims are dismissed.

### B.    The Claim that the Trial Judge Erred by Allowing a Demonstrative Crowbar into Evidence

Amaya alleged that "the trial court failed to call counsel and the prosecution, sua sponte, to

her office where the jury could not hear the objection of trial counsel being overruled on introduction of the State's 1 [*i.e.*, the demonstrative crowbar]." (Docket Entry No. 39-13, p. 2).  Amaya offered no legal authority supporting his claim that the judge was required to make this ruling outside the jury's presence.  The jury heard extensive evidence about how Amaya beat Rowland with a crowbar or similar blunt instrument.  Amaya did not establish there is a reasonable probability that the verdict might have been different had the exhibit not been admitted.  The claim is dismissed.

C.   **The Claim that the Trial Judge Erred in Allowing a Photographic Lineup into Evidence**

Amaya alleged that the trial court erred by admitting State's Exhibit number 125 into evidence.  This claim is meritless because, as explained above, the photographic lineup was not improperly suggestive or prejudicial.  The claim is dismissed.

D.   **The Claim that the Trial Judge Erred in Allowing an Audio Recording of Amaya into Evidence**

Amaya alleged that the trial court admitted State's Exhibit number 162 into evidence even though the prosecution had edited out the part of the recording in which Amaya stated that he has no criminal history. (Docket Entry No. 14-20, pp. 154-65).  Amaya does not identify why that made the audio inadmissible.  Nor can he show that including the edited statement would have created a reasonable probability that the verdict would be different.  The claim is dismissed.

E.   **The Claim that the Trial Judge Erred in Limiting Trial Counsel's Time for Closing Argument**

Amaya alleged that the trial court erred in limiting defense counsel's closing argument to 20 minutes. (Docket Entry No. 39-13, p. 4)(citing 4 RR 179, 194, 198, 199).   The Fifth Circuit recognizes that trial judges have "substantial discretion in placing time limits on closing arguments."

46

*U.S. v. Holt*, 493 Fed. App'x 515, 521 (5th Cir. 2012) (deferring to trial court's decision to give only five minutes for closing argument after a 3-day trial). There is no indication that the limit was unfair or that defense counsel could not make the points she wanted to make. This claim is dismissed.

F.    **The Claim that the Trial Judge Erred in Not Instructing the Jury On Reasonable Doubt When the Prosecution Introduced Extraneous Offenses**

Amaya alleged that the trial court erred by not instructing the jury "regarding reasonable doubt when the extraneous offense was introduced and concluded in the punishment phase of trial." (Docket Entry No. 39-13, p. 7). The court instructed the jury that:

> [y]ou may consider evidence of an extraneous crime or bad act in assessing punishment even if the defendant has not yet been charged with or finally convicted of the crime or act. However, you may consider such evidence only if the extraneous crime or bad act has been shown by the State beyond a reasonable doubt to have been committed by the defendant or is one for which the defendant could be held criminally responsible. The prosecution does not have to prove an extraneous crime or bad act beyond all possible doubt. The prosecution's proof must exclude all reasonable doubt concerning the extraneous crime or bad act. Therefore, if you find and believe beyond a reasonable doubt that the defendant committed an extraneous crime or bad act or could be held criminally responsible for an extraneous crime or bad act, then you may consider such evidence in assessing the defendant's punishment. However, if you have a reasonable doubt that the defendant committed an extraneous crime or bad act or could be held criminally responsible for an extraneous crime or bad act, then you may not consider such evidence in assessing punishment.

(Docket Entry No. 14-9, p. 44). The instructions properly stated the law. This claim is dismissed.

G.    **The Claim that the Trial Judge Erred in Failing to Require Notice from the State**

Amaya alleged that "[t]he trial court failed to ensure proper notices were filed by the State." (Docket Entry No. 39-13, p. 7). He did not specify which notices were not filed. His claim is conclusory, at best. Assuming that he was referring to his allegation that the prosecution did not file a notice of intent to file business record affidavits, the record undermines his claim. This claim is

dismissed.

## VII.  The Claims of Ineffective Assistance of Appellate Counsel

Amaya alleged that appellate counsel rendered ineffective assistance by failing to raise several issues on appeal.  Convicted defendants are entitled to effective assistance of counsel on direct appeal. *See Evitts v. Lucey,* 469 U.S. 387 (1985).  Counsel's appellate performance is reviewed under *Strickland v. Washington,* 466 U.S. at 687-88; *Goodwin v. Johnson,* 132 F.3d 162, 170 (5th Cir. 1998).  Amaya must allege and present facts that, if proven, would show that his appellate attorney's performance "fell below an objective standard of reasonableness." *United States v. Williamson,* 183 F.3d 458, 463 (5th Cir. 1999)(quoting *Strickland,* 466 U.S. at 688).  He must also show prejudice, by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones,* 163 F.3d at 302 (quoting *Strickland,* 466 U.S. at 694).  A reasonable probability makes the proceeding unfair or unreliable, so as to undermine confidence in the outcome.  *Green v. Johnson,* 160 F.3d 1029, 1043 (5th Cir. 1998)(citing *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993)).

Effective assistance of appellate counsel does not mean that counsel will raise every available nonfrivolous ground for appeal.  *See Evitts,* 469 U.S. at 394; *West v. Johnson,* 92 F.3d 1385, 1396 (5th Cir. 1996).  Rather, it means, as it does for trial counsel, that counsel performs in a reasonably effective manner. *See Evitts,* 469 U.S. at 394.  A reasonable attorney has an obligation to research the relevant facts and law and to make informed decisions as to whether to raise an issue on appeal. *See Strickland,* 466 U.S. at 690-91.

Amaya alleged that his appellate counsel failed to raise the issue of the crowbar as a demonstrative exhibit.  The trial court acted well within its discretion in admitting the crowbar.

Amaya did not ask for a limiting instruction, and there is no basis to infer that its absence was error or prejudicial. He cannot complain about the trial court's failure to give one. Amaya asserted a "probability that at least one juror overheard the trial court's finding" on the photographic lineup. (Docket Entry 39-13, p. 10). The record does not support this claim, and Amaya does not and cannot show how a juror overhearing the trial court's ruling could have impacted the trial outcome.

Amaya also complained about the trial court's admission of the audio recording without including his statement that he did not have a criminal history. (Docket Entry 39-13, p. 10). Amaya did not object to the editing. An appeal on that basis would have been precluded by the contemporaneous objection rule.

Amaya generally complained that his appellate counsel was deficient in failing to appeal based on the ineffective assistance of counsel. Amaya cannot rebut the presumption that his appellate counsel followed sound strategy in deciding how to approach the appeal. The record does not overcome the presumption of reasonable performance. This court has considered and rejected Amaya's claim of ineffective assistance of trial counsel; raising this claim on appeal would have been frivolous and futile. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001) (if each ground underlying counsel's alleged errors lacked merit, appellate counsel's failure to pursue relief on those grounds is not ineffective assistance of appellate counsel).

There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the appeal would have been different but for the errors. *Wilson v. Cockrell*, 2003 WL 21672834, at *11 (5th Cir. July 17, 2003); *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992). The Court of Criminal Appeals denied relief on this claim. The state court's decision regarding Amaya's claim of ineffective assistance of appellate counsel reasonably applied

the law to the facts, consistent with clearly established federal law.  Amaya has not shown a basis for the relief he seeks.  28 U.S.C. § 2254(d)(1).  This claim is dismissed.

## VIII.   Conclusion and Order

The respondent's motion for summary judgment, (Docket Entry No. 41), is granted. Amaya's motion for summary judgment, (Docket Entry No. 47), is denied.  Final judgment is entered by separate order.

A certificate of appealability is not issued.  The showing necessary for a certificate of appealability is a substantial showing of the denial of a constitutional right.  *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000)).  An applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further. *See Finley v. Johnson*, 243 F.3d 2150, 218 (5th Cir. 2001).  Amaya has not made the necessary showing.

SIGNED on February 28, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

50